IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


SHARAN V. STANWOOD,           )
                              )
            Plaintiff,        )
                              )   Civil No.03-1273-JE
     v.                       )
                              )
JO ANNE B. BARNHART,           )   FINDINGS AND RECOMMENDATION
Commissioner of Social        )
Security,                     )
                              )
            Defendant.        )
_____)

    Tim Wilborn
    WILBORN & ASSOCIATES, P.C.
    2020-C S.W. 8th Avenue, PMB #294
    West Linn, Oregon 97068-4612

        Attorney for Plaintiff

    Karin J. Immergut
    UNITED STATES ATTORNEY
    District of Oregon
    Craig J. Casey
    ASSISTANT UNITED STATES ATTORNEY
    1000 S.W. Third Avenue, Suite 600
    Portland, Oregon 97204-2902

            David R. Johnson
            SPECIAL ASSISTANT UNITED STATES ATTORNEY
            Social Security Administration
            701 5th Avenue, Suite 2900 M/S 901
            Seattle, Washington 98104-7075

                Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Sharan V. Stanwood brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). I recommend that the Commissioner's decision be reversed and remanded for an award of benefits.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB in March 2001, alleging disability beginning March 20, 2000. After her application was denied initially and on reconsideration, plaintiff appeared for a hearing before an Administrative Law Judge (ALJ). The ALJ found plaintiff not disabled. The ALJ's decision became final when the Appeals Council denied plaintiff's request for review.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on combined impairments, which include immunoglobulin A (IgA) deficiency causing chronic infections, hepatitis C, migraine headaches, fibromyalgia, carpal tunnel syndrome, shoulder tenosynovitis, hearing loss, personality disorders, and depression.

At the time of the hearing, plaintiff was forty-three years old. She had an associate of arts degree and had studied

2  - FINDINGS AND RECOMMENDATION

accounting for one year. She had past relevant work as an accounting clerk.

## I. Medical Evidence

### A. Physical Impairments

Plaintiff's IgA deficiency is considered a life-long condition with no cure. See Pltf.'s Br. at 2 n.1 (citing Mosby's Medical and Nursing Dictionary). IgA deficiency is associated with autoimmune abnormalities. At the hearing, plaintiff testified that IgA deficiency "causes me to come down with every little thing that comes my way, the flu, pneumonia, sinus infections, pelvic inflammatory diseases, upper respiratory disease with kidney infections." R. at 33. Plaintiff stated that she suffers from serious infections about every three months, and that the infections last three to six weeks. The medical expert at the hearing testified that IgA deficiency "does contribute to someone's susceptibility for a large number of infections," which often recur. R. at 51.

Plaintiff testified that she suffers from fibromyalgia. One of plaintiff's treating physicians, Dr. Marjorie Hrbek, examined plaintiff for a flare-up of fibromyalgia in September 2001. Dr. Hrbek stated that plaintiff had "a known history of fibromyalgia" since the mid-1990s, and had suffered occasional flare-ups lasting one to three weeks. R. at 388. Dr. Hrbek found that while plaintiff had normal range of motion in her joints, there was tenderness especially when moving her wrists or

ankles bilaterally.  Dr. Hrbek also reported that plaintiff "has some fibromyalgic trigger points especially around her head and neck region."  R. at 387.

Plaintiff testified that she takes ibuprofen for joint pain, but the pain is still between 6 and 7 on a scale of 0 to 10. Plaintiff testified that because high doses of ibuprofen caused gastritis and other stomach problems, she had to balance stomach pain and joint pain.

Plaintiff has hepatitis C, which she testified was a possible cause of joint pain, arthralgia, and fatigue.  Tests in 2001 showed some elevated results, while tests in 2002 showed normal liver functioning.

Plaintiff testified that she suffers from carpal tunnel syndrome in both arms, which had significantly worsened since she last worked in 2000.  She stated that the pain, numbness, and tingling had intensified.  Plaintiff refused surgery because she was not convinced it would improve the condition.  However, the medical expert testified at the hearing that no medical tests in the record indicated that plaintiff had carpal tunnel syndrome.

Plaintiff has a mild to moderate hearing loss.  Hearing aids did not work well for her so she read lips to follow conversations.

Plaintiff suffers from gastroesophageal reflux disease with a hiatal hernia.  She had a history of bulimia and anorexia. Plaintiff received surgery for the hiatal hernia in May 1998.

The surgery helped, although plaintiff still suffered from episodes of epigastric pain.

   **B.  Mental Impairments**

In April 2001, when plaintiff was about thirty-four weeks pregnant, she became very upset that her husband was using urethane varnish during a remodeling project.  Plaintiff was admitted to a hospital because of suicidal ideation.

Dr. Brian S. Liebreich evaluated plaintiff at the hospital on April 17, 2001.  Plaintiff said she had been taking Paxil since 1994 and was addicted to it.  She denied needing treatment for depression but "wanted to go on something like Paxil because she thinks everyone should be on a medicine for depression." R. at 320.  Dr. Liebrich diagnosed major depression, severe, without psychotic features, and found that plaintiff's current Global Assessment of Functioning (GAF) score was 30.

The next day, Dr. Robert Gold gave plaintiff a psychiatric assessment.  Plaintiff insisted that she was not suicidal or homicidal towards her husband.  Dr. Gold concluded that plaintiff had "a dysthymic disorder and a moderate impairment from a borderline personality disorder."  R. at 310.  Dr. Gold diagnosed chronic adjustment disorder with depression and anxiety; personality disorder; and a GAF of 65.  Plaintiff was discharged.

In September 2001, plaintiff saw Dr. James W. Eastman, a psychiatrist, to begin treatment.  Plaintiff said that her father, who died when she was fifteen, had been physically and

emotionally abusive. Dr. Eastman diagnosed post-traumatic stress disorder with possible dependent personality features. Dr. Robert Loveland, a psychologist, agreed with the diagnosis of post-traumatic stress disorder, based on an MMPI test and his examination of plaintiff.

A review psychologist, Dr. Dick Wimmers, found that plaintiff would be moderately limited in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to accept instructions and respond appropriately to criticism from supervisors. Dr. Wimmers thought that plaintiff "may react negatively to a critical male supervisor but is able to tolerate normal direction and supervision." R. at 422. Dr. Wimmers also thought that plaintiff's symptoms of depression and anxiety "restrict her to simpler procedures if she is to consistently sustain concentration and pace." Id.

**II. Plaintiff's Testimony**

At the time of the hearing, plaintiff had three children living at home, ages 19 months, 3 years, and 11 years. Plaintiff also had a 20-year-old daughter, who helped with housework.

Plaintiff testified that she could sit, stand, or walk for about half an hour at a time. Sitting caused plaintiff to suffer back pain, while standing caused pain in her knees, hips, and back. Plaintiff stated that she took a nap with her youngest child for about two hours almost every afternoon.

Plaintiff testified that she could lift about ten pounds. Plaintiff stated that she did pick up her youngest child, who then weighed about twenty pounds, but that it caused her "a great deal of pain." R. at 42.

Plaintiff prepared about one meal a day, did dishes using a dishwasher, put laundry in the washer and dryer, and vacuumed. Plaintiff's husband[1] shopped for groceries, cooked, and did other chores.

## III. Expert Testimony

At the hearing, a medical expert, Dr. Lawrence Duckler, and a vocational expert, Kathryn Heatherly, testified.

### A. Medical Expert's Testimony

Dr. Duckler testified that "from an objective point of view," plaintiff had no physical limitations that would affect her residual functional capacity. R. at 51. He stated that plaintiff's joint pain had no established physical cause, including fibromyalgia, in the record. Dr. Duckler did not mention Dr. Hrbek's report on plaintiff's fibromyalgia.

### B. Vocational Expert's Testimony

The vocational expert, Kathryn Heatherly, testified that plaintiff's past relevant work as an accounting clerk was sedentary skilled work. The ALJ presented Heatherly with the following hypothetical: a worker who is moderately limited in

---

[1] At the time of the hearing, plaintiff and her husband were in contested divorce proceedings.

7 - FINDINGS AND RECOMMENDATION

her ability to carry out detailed instructions; moderately limited in her ability to maintain attention and concentration for extended periods; moderately limited in the ability to accept instructions; and moderately limited in the ability to respond appropriately to criticism from supervisors.  Heatherly stated that such a person could perform plaintiff's past relevant work.

Plaintiff's attorney then asked the vocational expert about a hypothetical worker with additional limitations: limited to sitting or standing to thirty minutes at a time; limited to lifting fifteen pounds occasionally and ten pounds repetitively; moderately limited in ability to use her hands for repetitive actions; moderately limited in ability to concentrate because of pain and other factors; a need for clean air; and a moderate limitation in the ability to persist at pace.  The vocational expert stated that with these additional limitations, the person could not return to her past relevant work, but only because of the limit on repetitive hand motion.  The vocational expert stated that including the limit on hand motion, the hypothetical person could perform jobs such as appointment clerk and information clerk, which are sedentary semi-skilled jobs, or hotel desk clerk, which is a light semi-skilled job.

Plaintiff's attorney then presented the expert with another hypothetical, omitting the wrist limitations but including a marked limitation in the ability to concentrate because of pain and other factors.  The vocational expert stated that such a

person would not be employable. The ALJ stated, "I take judicial notice of the fact that any person missing two days or more per month on a consecutive basis more than one month is not going to maintain employment in today's economy." R. at 56.

## THE ALJ'S DECISION

The ALJ found that plaintiff had not engaged in any substantial gainful activity since the alleged onset of disability. The ALJ found that plaintiff had dysthymia, an adjustment disorder with depression and anxiety, and a personality disorder. Her mental impairments were severe but did not meet or equal any listed impairments.

The ALJ determined that plaintiff "retains a residual functional capacity without physical limitations." R. at 22. The ALJ found that plaintiff "has moderate difficulties at carrying out detailed instructions, maintaining attention and concentration for extended periods, and accepting instructions and responding appropriately to criticism from supervisors." R. at 22. He concluded that plaintiff's impairments would not prevent her from performing her past relevant work as an accounting clerk, and that she could perform other jobs.

## STANDARD OF REVIEW AND SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted

or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991).  The claimant bears the burden of proving disability.  Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can do so, then she is not disabled.  If she cannot perform past relevant work, the

burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets her burden and proves that the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a mere scintilla" but "less than a preponderance."  Id.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Id.

**DISCUSSION**

**I. The ALJ Improperly Discredited Plaintiff's Testimony**

Plaintiff contends that the ALJ erred in failing to credit her testimony.  I agree.

**A. Standards**

The ALJ determines the claimant's credibility.  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001).  When determining the credibility of a claimant's complaints of pain, the ALJ may consider the claimant's daily activities, inconsistencies in testimony, adverse side effects of any pain medication, and

11 - FINDINGS AND RECOMMENDATION

relevant character evidence. <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995) (per curiam); <u>see</u> <u>also</u> <u>Batson v. Commissioner</u>, 359 F.3d 1190, 1196-97 (9th Cir. 2004). The ALJ must make specific findings to support any rejection of the claimant's subjective testimony. <u>Connett v. Barnhart</u>, 340 F.3d 871, 873 (9th Cir. 2003); <u>Dodrill v. Shalala</u>, 12 F.3d 915, 917 (9th Cir. 1993). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).

**B. Discussion**

The ALJ found that plaintiff's "statements concerning her impairments and their impact on her ability to work are not entirely credible in light of information contained in the medical reports and other evidence of record." R. at 21. There is no evidence that plaintiff was malingering, so the ALJ's reasons for rejecting plaintiff's testimony must be clear and convincing. The ALJ's reasons do not meet this standard.

As one reason for discrediting plaintiff, the ALJ cited plaintiff's ability to perform "some household chores," and noted that "she can take care of three very young children, apparently quite well." R. at 26. The ALJ also relied on the statements of

plaintiff's husband that plaintiff could do "some shopping, household chores, and occasional gardening." Id.[2]

However, the record indicates that plaintiff did relatively few chores, relying on her husband and her adult child for help. She stated that she did "only very light housework occasionally with lots of rest in between tasks," or else she became exhausted. R. at 150. Plaintiff took a two-hour nap with her youngest child every afternoon. This level of activity is not inconsistent with plaintiff's testimony about the extent of her limitations.

At the hearing, plaintiff did testify that she picked up her youngest child, who weighed about twenty pounds, even though the action caused her pain. The ALJ responded, "the next question is why don't you work with the pain because the law does not say you're entitled to work pain free? So, why don't you work with the pain?" R. at 42.[3] Plaintiff's willingness to pick up her child does not discredit her testimony.

It is undisputed that plaintiff suffers from IgA deficiency and that the deficiency causes recurrent infections. Dr. Duckler, the medical expert who testified at the hearing, stated

---

[2]The ALJ acknowledged that plaintiff and her husband were divorcing, but considered her husband's report "credible to the extent that it is consistent with the medical reports." R. at 20.

[3]Plaintiff responded to the ALJ's question by stating that aside from the pain, she also suffered from fatigue and recurrent infections.

13 - FINDINGS AND RECOMMENDATION

that plaintiff's IgA deficiency would be expected to cause recurrent infections. Dr. David E. Bilstrom, an allergist who examined plaintiff, stated, "Obviously many of her problems resolve around the IgA deficiency and the chronic sinus infections." R. at 268.

The ALJ, however, did not consider the deficiency to be a significant limit on plaintiff's residual functional capacity. Plaintiff testified that she suffered from recurrent upper respiratory infections, including sinusitis and pneumonia, about every three months, and that the infections lasted three to six weeks. Plaintiff suffered from bronchitis with coughing so severe that she damaged her diaphragm, leading to a hiatal hernia. R. at 267. In addition, the IgA deficiency may cause plaintiff's joint pain. Dr. Bilstrom stated that "IgA deficiencies are also associated with an increased tendency to have rheumatoid arthritic changes." R. at 268.

Defendant argues that because plaintiff previously worked full-time despite her IgA deficiency, her assertions regarding the seriousness of the condition should not be credited. However, plaintiff explained that since she last worked in 2000, the recurrent infections had worsened. The record indicates that plaintiff frequently sought treatment, sometimes in emergency rooms, for acute sinusitis or bronchitis, as well as other infections. See, e.g., R. at 222 (bronchitis, June 1999); 261 (sinusitis, November 2000); 253 (sinusitis, January 2001); 258-60

(pneumonia, February 2001); 273 (sinusitis, March 2001); 386 (sinusitis, November 2001); 384 (sinusitis, March 2002); 347 (chest cold, August 2002).  The ALJ did not properly justify his decision to disregard plaintiff's testimony that the infections have been more severe since she last worked.

In ruling that plaintiff had no physical limitations, the ALJ discounted plaintiff's testimony about the extent of her joint pain.  Although plaintiff's treating physicians have different theories about the cause of plaintiff's joint pain, including IgA deficiency, fibromyalgia, and hepatitis C, uncertainty about the cause of the joint pain does not undermine plaintiff's testimony that it limits her ability to lift more than ten pounds frequently, or to sit or stand for more than a half hour.

I conclude that the ALJ lacked the required specific reasons based on clear and convincing evidence to reject plaintiff's testimony regarding the severity of her IgA deficiency, joint pain, and fatigue, and the resulting limitations on her ability to work.  When the ALJ improperly discredits a claimant's testimony, and the claimant would be disabled if her testimony were accepted, the court should accept the claimant's testimony as a matter of law rather than remanding for further findings. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (citing Varney v. Secretary of Health & Human Services, 859 F.2d 1396, 1401 (9th Cir. 1988)); but cf. Connett, 340 F.3d at 876 (court not required

to credit claimant's testimony if questions remain on credibility and other issues must be resolved before a determination of disability can be made).  Here, the ALJ stated that if plaintiff's infections caused her to miss two or more days of work per month, she would be disabled for Social Security purposes.  The ALJ's statement regarding the effect of such absences is reasonable.  See, e.g., Ploesser v. Apfel, Civ. No. 98-1543-ST, 2000 WL 92811, *18 (D. Or. Jan. 18, 2000) ("The VE testified that a two-day absence from work every month would render a person unemployable"); Key v. Barnhart, 324 F. Supp. 2d 1288, 1291 n.13 (N.D. Ala. 2004) (vocational expert "testified that any absence in excess of two days per month would be inadequate attendance for entry level jobs"); Bennett v. Barnhart, 288 F. Supp. 2d 1246, 1255 (N.D. Ala. 2003) ("Typically from a vocational standpoint if a person misses more than 25, 24, 25 days in a 12 month work period that would preclude work activity"); Liter v. Apfel, 2001 WL 304046, *5 (D. Kan. Feb. 16, 2001) (vocational expert testified that "if [the plaintiff] had to miss two or three days per month because of his medical problems, plaintiff would not be able to perform the sedentary jobs or any job").  The ALJ also stated that if he were to credit plaintiff's testimony generally, he would be compelled to find her disabled.

Considering the combined effect of plaintiff's recurrent infections, joint pain, fatigue, and mental impairments, it is

reasonable to assume that plaintiff would miss at least an average of two to three days per month. The record indicates that plaintiff's recurring infections by themselves could cause her to miss two or three days per month. Crediting plaintiff's testimony regarding her recurrent infections, fatigue, and chronic pain, I conclude that plaintiff is disabled for Social Security purposes.

**II. Other Issues Raised by Plaintiff**

Plaintiff contends that the ALJ made flawed and incomplete findings on the other jobs he stated that plaintiff could perform, and that the ALJ failed to give plaintiff a full and fair hearing. The court need not address these issues because the ALJ erred in finding that plaintiff was not disabled.

**III. No Further Proceedings Are Required**

The record establishes that plaintiff's impairments in combination prevent her from working full time, so she is disabled within the meaning of the Act. The record is fully developed, and further administrative proceedings would serve no useful purpose. See Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

**CONCLUSION**

The Commissioner's decision should be reversed and a judgment should be entered remanding this action for an award of benefits. Any pending motions should be denied as moot.

**SCHEDULING ORDER**

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due October 21, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 5th day of October, 2005.

/s/ John Jelderks
John Jelderks
U.S. Magistrate Judge